80 So.2d 457 (1955)
Dorothy M. GRAMMER, individually, and as Administratrix of the estate of William A. Grammer, Deceased, Appellant,
v.
Violet GRAMMER, Jay William Grammer, and Robert Grammer, Appellees.
Supreme Court of Florida. Special Division B.
May 11, 1955.
*458 R.K. Bell and W.D. Bell, Miami, and Howard G. Livingston, Sebring, for appellant.
Paul E. Gringle and Charles Byron, Delray Beach, for appellees.
DREW, Chief Justice.
William Grammer married Violet Grammer in Detroit, Michigan, January 20, 1920. For about a year after the marriage they lived at 3650 Cass Street in Detroit. The next six years, during which a son was born, they lived at 1500 Taylor Street in said city. While living at the Taylor Street address, William left to seek, and did find, employment in New York. While the record is not entirely clear on the point, either shortly before or after William moved to New York, his wife and child moved in with her parents at the home owned by her brother at 5345 Harding Avenue. There is also some conflict as to whether between 1926 and 1931 William visited his wife at the Harding Street address. It is clear and undisputed, however, that they never lived together after 1931, and that he never corresponded with her or saw her from 1932 to the time of his death in Florida, some twenty years later. Nor did he see his son or hear from him  so he testified  during these years. The son, however, did testify that he saw his father in New York in 1945.
In 1948 William, because of bad health, moved to Florida. Some three years later, he instituted suit for a divorce from Violet in the Circuit Court of Palm Beach County and secured a favorable final decree on August 10, 1951. Three months later William married Dorothy Margaret Anderson. They lived together as man and wife until the death of William on January 26, 1953.
The litigation now before us was commenced in July 1953 and was instituted by Violet and her son Jay, and Robert Grammer a son by a prior marriage, against Dorothy M. Grammer (the widow) individually, and as administratrix of William's estate.
The purpose of the litigation was to have set aside and declared void the decree of divorce of August 10, 1951 between William and Violet and to establish plaintiffs as the sole heirs of William. The complaint alleged that plaintiffs never learned of the decree under attack until February 1953. The charges of fraud set forth in the complaint as a basis for the relief prayed were that at and before the filing of the complaint and at all times thereafter Violet was residing at 5345 Harding Avenue in Detroit, but nevertheless, and for the purpose of deceiving the court and preventing Violet from learning of said suit and interposing a defense thereto  which she said she had  he falsely, fraudulently and corruptly alleged in the sworn complaint that he had "made diligent search and inquiry to discover the residence and post office address of the defendant, Violet Grammer, and that the residence and post office address of said defendant, and particularly as the same is known to plaintiff, is Harding Avenue, Detroit, Michigan. That the street number of the address of said defendant is unknown to plaintiff and despite the fact that plaintiff has made a diligent search and inquiry to discover more particularly the address of said defendant, plaintiff has been unable to obtain a more specific address."
Issues were made upon answer filed by the defendant, who is the appellant here, and the cause was tried before the lower court. The decree is short so we here quote the material portion.
"It appears that at the time the deceased filed suit for divorce in the *459 Circuit Court of Palm Beach County, his wife was residing at the same address where the two of them had last lived together as husband and wife. No effort was made to serve her at that address.
"Not only must a party to litigation when seeking constructive service process, make `diligent search', but he must likewise make `diligent inquiry'. A diligent search requires that the plaintiff be constant and painstaking in effort or exertion to locate the address of the party in question. A diligent inquiry requires that plaintiff resort to all available sources of information to locate the party in question. In this case the conclusion is justified that the husband deliberately withheld from his attorney information regarding the whereabouts of his wife, and that therefore a fraud was committed upon the Court. Thereupon,
"It Is Ordered that the said Decree of Divorce entered by this court August 10, 1951, in that certain cause wherein William A. Grammer was plaintiff, and Violet Grammer was defendant, being Chancery No. 28,070, is vacated, set aside and shall be held for naught."
The evidence before the lower court consisted of the testimony of Violet, the son Jay, and Jerrold Jacob, the attorney who represented William when he procured the divorce, together with the entire proceedings in the divorce litigation, including all the evidence received in the first suit.
We have heretofore quoted the allegations of the complaint relating to William's knowledge of the residence and post office address of Violet. The language of the sworn statement for constructive service is a clear compliance with the statutory requirements of section 48.04, F.S. 1951, F.S.A., and this fact is not questioned. That the notice to appear strictly complies with the statutory requirements as to substance, form, and the period of publication is not questioned. At the hearing before the Master a great deal was testified concerning the whereabouts of the defendant Violet. There is evidence of William's sister who then resided in Ann Arbor, Michigan, not far from Detroit, that she had not seen Violet since about 1928, and in answer to a direct question as to whether she knew Violet's address she stated that she did not know her address nor had she seen or heard from her in some twenty or twenty-five years. William testified in the divorce suit with reference to the matter as follows:
"Q. Now, in your bill for divorce, which was sworn to, you stated you made a diligent search and inquiry to discover the residence and post office address of Violet Grammer, whom you allege to be your wife, and that the residence and post office address of that defendant, Mrs. Grammer, as particularly the same as known to you, is Harding Avenue, Detroit, Michigan. Now, I want you to tell the Court what you did in the way of attempting to locate your wife, the defendant, and why that is the best information you have? A. Harding Avenue is where her parents owned a home after I had left Detroit and I never did know the number of the Street anymore than just through memory that it was on Harding Avenue someplace; I got a Detroit directory and tried to locate her there and couldn't find it and also, I contacted my sister in Ann Arbor, Michigan, not too far outside of Detroit and asked her if she could locate her.
"Q. What is your sister's name? A. Erdman, Mrs. Arthur Erdman.
"Q. What is her first name? A. Mabel.
"Q. Now, when you refer to this Mrs. Otto Erdman, is she the same person as the person who signed a letter purportedly written to you on March 2, 1951 and signed "Mabel"? A. Mabel, yes.
"Q. Is that your sister? A. Yes, sir.

*460 "Q. Now, is this letter which I hand you, in reply to an effort on your part to locate the address of your wife? A. This letter is in reply to a request that I asked her to try to locate her to give me information.
"Q. Concerning your wife? A. Concerning Mrs. Grammer."
Mr. Jacob: Plaintiff offers in evidence a letter signed "Mabel" and addressed "Dear Bill", dated March 2, 1951, as plaintiff's exhibit No. 1.
The Special Master: Accepted in evidence as plaintiff's Exhibit No. 1. (Marked PX No. 1 and received.)
By Mr. Jacob:
"Q. Now, how long has it been since you have even seen Mrs. Grammer? A. 1931.
"Q. You have not seen her since that time? A. No, sir.
"Q. Have you heard from her since that time? A. No, sir.
"Q. So then there is approximately a period of twenty years that you have neither seen or heard from her? A. Approximately."
Moreover, after Mr. Jacob had concluded his examination of William the Special Master interrogated him on this subject as follows
"Q. And you haven't heard from her since that time? A. I have not.
"Q. That accounts for, I suppose, your difficulty in giving her residence? A. That accounts for it, yes, sir.
"Q. Do you know anyone that might know where she is? A. Well, I've endeavored to locate anybody that I knew that would know her and the only that I could, [sic] after being away from there so many years, I didn't know anybody who I could actually go to outside of my sister, and I believe if there was a possibility of my sister locating Mrs. Grammer she would have and give me her correct address, and I can tell you this: that I didn't tell my sister that I was looking for a divorce at all, it was just a question that I wrote her a letter asking her if she could give me that information.
"Q. Of course, we are interested in seeing that the defendant has some notice of this thing if it is possible at all, that is the only reason for this line of questioning. A. Yes, sir."
The letter referred to in the testimony of William is dated March 2, 1951, approximately a month and one-half before the litigation was commenced and reads as follows:
"Dear Bill: This is in reply to your letter requesting information on the whereabouts of Violet. I don't know where she lives or haven't heard from her for many, many years. I have ask Mother if she knows where she is and she says she doesn't know either. Trusting that everything if okay with you and that will see you soon."
On the basis of this and other evidence the Master recommended the entry of a decree of divorce and the Circuit Court entered such decree. Margaret thereafter entered into the marriage relation with William, living with him as his wife for nearly three years before his death. It was only after William's lips had been sealed in death and he had left an estate that she might share that Violet evidenced any interest whatever and this after more than twenty-two years of silence.
The testimony of the attorney Jacobs in the present suit establishes beyond any doubt that so far as the requirements, laid down by this court in McDaniel v. McElvy, 91 Fla. 770, 799, 804, 108 So. 820, 831, 832, 51 A.L.R. 731, were concerned the statutes providing for constructive service were complied with. In that case, in speaking of reasonable diligence, we said:
"The test, however, is not whether it was in fact possible to effect personal service in a given case, but whether *461 the complainant reasonably employed knowledge at his command, made diligent inquiry, and exerted an honest and conscientious effort appropriate to the circumstances, to acquire the information necessary to enable him to effect personal service on the defendant.
* * * * * *
"Extraordinary steps to ascertain the whereabouts of the party are not required. * * * Reasonable diligence in such matters is an honest effort, and one appropriate to the circumstances, to ascertain whether actual notice may be given, and, if so, to give it. Such effort, however, need not embrace a search in remote parts of the state (Jacob v. Roberts, 223 U.S. 261, 32 S.Ct. 303, 56 L.Ed. 429); and it is not essential that all possible or conceivable means should be used. But the effort should usually extend to inquiry of persons likely or presumed to know the facts sought."
The only other evidence before the court in this litigation was that of Violet, and her son Jay. Violet testified concerning the relationship of the parties until 1931 or 1932, which are narrated in the forepart of this opinion. She testified that William visited her about every three weeks or so after she moved to 5345 Harding Avenue, which house was owned by her brother, one Joseph Colisimo. She admitted that she has never seen her husband, nor corresponded with him after 1932. She unequivocally stated that she last saw her husband June 6, 1932, at her home 5345 Harding Avenue. She testified that there was a telephone listed in her brothers name at 5345 Harding Avenue, New York, but there is nothing whatever in the record that even indicates that William remembered the name of her brother, or knew that the house was in his name. Moreover, it is highly improbable that after twenty years he would remember such street number.
The son, Jay, testified that his father left home when he was about six years old, at which time he was living at 5345 Harding Avenue, and that the only time he saw, or heard from his father since that time was in 1945 when he saw him in New York City.
The burden was on the plaintiffs in the court below, the appellees here, to establish the charges of fraud made against William in the procurement of the divorce by clear and convincing evidence, Dye v. Dolbeck, 114 Fla. 866, 154 So. 847, especially "where the party charged with the fraud is dead." Barnes v. Willis, 65 Fla. 363, 61 So. 828, 829. This is particularly true where inquiry was made and evidence taken in the question of diligent search in the proceedings for divorce, and where the court in that case passed upon said evidence and entered its decree based thereon. It is clear that the plaintiffs failed to carry this burden. Moreover, we think the record viewed as a whole shows not only that the husband acted in good faith in the proceedings but also that in the matter of diligent search and inquiry what was done by the husband and his attorney was more than sufficient to establish compliance with the minimum requirements of the law in that connection.
Reversed.
TERRELL, THOMAS and HOBSON, JJ., concur.